**AFFIDAVIT**

I, James Peters, Task Force Officer, U.S. Drug Enforcement Administration ("DEA"), being sworn, depose and state as follows in support of my application for a complaint charging **GINO ROMANO** with conspiring to possess with intent to distribute and distribute cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 846 ("the Target Offense").

## I.    INTRODUCTION

1.      I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516, Title 18, United States Code.

2.      I have been assigned as a Task Force Officer ("TFO") with the Drug Enforcement Administration ("DEA") since 2016.  I am dually assigned as a Detective with the Braintree Police Department Drug Control Unit since February 2014 and to the Boston Office of the New England Division of the DEA since June 2016, where I am currently assigned to Task Force Group 5.

3.      As a DEA TFO, I am authorized to investigate violations of the laws of the United States, including violations of Title 21 and Title 18 of the United Stated Code.  I received training regarding narcotics investigations while attending the DEA Basic Narcotics School and attended additional specialized training courses in furtherance of my past and current assignments.

4.      I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, introduction of undercover agents, execution of search warrants, effecting arrests, and debriefing defendants, informants, and witnesses who had personal knowledge regarding major narcotics trafficking organizations.  I also have reviewed

recorded conversations and telephone, financial, and drug records.  Through my training and experience, I became familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs.  I also became familiar with the manner in which narcotics organizations utilize various forms of violence and intimidation in furtherance of their narcotics trafficking activity to protect their operations, members, narcotics, and narcotics proceeds.

5.      Based on my training and experience, I know that drug traffickers commonly use cellular telephones to communicate about and further their drug trafficking activities, but are aware of law enforcement's use of electronic surveillance.  Thus, drug traffickers frequently change cellular telephone numbers and/or cellular telephones, use multiple cellular telephones simultaneously, use prepaid cellular telephones (where a phone's subscriber is not required to provide personal identifying information), and use cellular telephones subscribed under a different person's identifying information to thwart law enforcement's use of electronic surveillance.  I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business to prevent detection and often use text messages in lieu of phone calls to avoid speaking over the telephone.

6.      The facts in this Affidavit have come from my personal observations, my training and experience, and information obtained from other agents, task force officers, and state and local law enforcement officers.  The word "agent" or "investigator" is used in this Affidavit for all federal, state, and local law enforcement officers.  This affidavit is submitted for the limited purpose of establishing probable cause for the issuance of a criminal complaint charging **GINO ROMANO** ("Target Subject") with conspiring to distribute and to possess with intent to distribute

cocaine, a Schedule II controlled substances, in violation of Title 21, United States Code, Section 846.

7.      Since this affidavit is being submitted for the limited purpose of securing the requested arrest warrants, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause for the issuance of the requested arrest warrants.

## II.      SUMMARY OF THE INVESTIGATION

### A. Background of the Investigation[1]

8.      This case involves an approximate 10-month investigation by the Drug Enforcement Administration, working with other state and local agencies, including the Boston Police Department ("BPD"), between approximately November 2018 and September 2019.  That investigation focused on the drug-distribution activities of a drug-trafficking organization ("DTO") that Matthew DRAYTON and Arthur HODGES, along with their co-conspirators, operated within the Boston area.  The investigation also ultimately resulted in a broader investigation into one of M. DRAYTON's co-conspirators, his brother K. DRAYTON, who ran a separate and complementary drug-trafficking conspiracy (which has been charged by a separate complaint).

9.      M. DRAYTON and HODGES, along with their co-conspirators, used locations in the Commonwealth Development in Brighton, Massachusetts ("Fidelis Way") in Brighton, Massachusetts, to distribute cocaine and cocaine base ("crack") in Boston, Massachusetts.  Fidelis

---

[1] I incorporate by reference my affidavit submitted in support of a Criminal Complaint charging Matthew DRAYTON and others, including Keith DAYE (K. DAYE), in Case Number 20-MJ-2430-MBB. In that affidavit, ROMANO was identified in ¶¶ 92-98 as G.R.

Way is a multi-apartment public housing development whose residents range from multi-generation families to elderly individuals. The investigation showed that M. DRAYTON, HODGES, and their associates, through their drug-trafficking activities, assumed control over multiple Fidelis Way apartments, which they operated as "stash house" locations where they stored, cooked, packaged, and sold their drugs.

10.     The investigation involved controlled purchases of narcotics, physical surveillance, pole camera surveillance, review of subscriber data, review of pen register and trap and trace information, analysis of telephone records, and executing search warrants, including for precise location information from cellular telephones. The investigation also involved the interception of wire and/or electronic communications from over twenty cellular telephones belonging to various Target Subjects over an approximate thirteen-month period.

11.     Initially, the investigation involved over ten controlled purchases of drugs from M. DRAYTON, HODGES, and K. DRAYTON (collectively). In May 2019, agents first received authorization to intercept wire and/or electronic communications from various Target Subjects' cellular telephones, beginning with M. DRAYTON. As the wire investigation progressed, investigators identified M. DRAYTON and HODGES conspiring regarding drug supply and drug distribution within their DTO. Physical and electronic surveillance further corroborated HODGES and M. DRAYTON's drug-distribution business relationship and resulted in the identification of drug suppliers, drug distributors, drug runners, and drug customers. In particular, as a result of the investigation into M. DRAYTON, investigators identified K. DRAYTON as one of M. DRAYTON's main suppliers, and Arthur HODGES as one of M. DRAYTON's main distributors who also has mainly overseen the drug-trafficking activities within Fidelis Way. Further, the investigation has identified other supplies, including Terrence DAYE, Jean AMAN, and Keith

4

DAYE, within the M. DRAYTON-HODGES DTO.  Investigators also intercepted and surveilled the M. DRAYTON-HODGES DTO's drug distributors and drug runners, including Nelsin HERNANDEZ and Philip WILLIAMS.

### B.  The Wire Investigation

12.     Based on the initial investigation into M. DRAYTON from November 2018 to May 2019, law enforcement investigators concluded that M. DRAYTON engaged in drug-trafficking activities with others within the Boston area.  In May 2019, law enforcement investigators received authorization to intercept wire and electronic communications from M. DRAYTON's cellular telephone.  These interceptions revealed that M. DRAYTON, in coded or vague language, arranged to distribute and distributed cocaine or cocaine base on a regular basis.  Interceptions from M. DRAYTON's cellular telephones identified other members of his drug trafficking organization, including K. DRAYTON (M. DRAYTON's brother), whom agents identified as one of M. DRAYTON's main suppliers; Arthur HODGES, another supplier and drug distributor for M. DRAYTON; HERNANDEZ, who distributed drugs for M. DRAYTON and HODGES; and T. DAYE, who supplied drugs to HODGES that he obtained from K. DAYE, his cousin.[2]  In addition to capturing M. DRAYTON's regular communications with co-conspirators about drug meetings, drug deliveries, drug supply, and drug sales, agents corroborated the intercepted drug-trafficking calls with surveillance.

13.     Over the course of this investigation, federal agents and task force officers have purchased and seized approximately 700 grams of a controlled substance that initial testing has

---

[2] In my previous affidavit on June 23, 2020, I said that K. DAYE and T. DAYE were brothers. I believe that they are cousins.

confirmed to be cocaine (and which, based on my training and experience, consists of both powdered cocaine and cocaine base) and approximately twenty-seven pounds of marijuana. Investigators also have seized about $200,000 in cash, over 200 rounds of ammunition, and at least one firearm.  Some of these seizures, along with related intercepted communications and surveillance observations, are described herein.

14.     Below, I also describe numerous intercepted calls and identify the participants in those calls.  Those identifications are based on a combination of several factors, including the following: (1) intercepted statements concerning the user's location or activity that were consistent with ongoing physical or electronic surveillance; (2) identification, by name, of the users of the telephones during the intercepted communications; and (3) cell phone subscriber information.  I base my interpretations of these communications upon my training and experience, the training and experience of other investigators, and my involvement in this investigation.  Quotations from telephone conversations are based on preliminary transcripts and/or synopses ("line sheets") that are subject to revision.  All times referenced herein are approximate.

### III.    PROBABLE CAUSE

15.     On February 21, 2020, at 8:44 p.m., K. DAYE used Target Telephone 18 to contact ROMANO on telephone number (857) 236-4438.  K. DAYE said, "10-5."  ROMANO asked, "10-5?"  K. DAYE said, "Yeah."  ROMANO replied, "That's (u/i) huh?"  K. DAYE said, "Huh? That's a nina."  ROMANO replied, "Yo, a 10-5."  K. DAYE confirmed, "Yeah."  ROMANO said, "Aight, so… (u/i)"  K. DAYE responded, "10,500."  ROMANO remarked, "Whoa, shit Keith.  I'll take, how much is the um… a forty?  I mean a four play."   K. DAYE answered, "Half of that."  ROMANO asked, "Aight, so when can you do it?  Tomorrow?"  K. DAYE said, "Tomorrow."  ROMANO stated, "I'll call you."  K. DAYE replied, "Are you sure?  I don't want to order it, you

know what I mean?" ROMANO said, "Yeah, but that's a lot of money dog. Goddamn, I was

getting it for 47." K. DAYE replied, "Hold on, hold on." ROMANO said, "Forty-seven for a four

play." K. DAYE ultimately told ROMANO that he would call him back, but there was no return

call that day on either of K. DAYE's phones (Target Telephone 10 or Target Telephone 18).

16.     Based on the call's substance, as well as my training, experience, and work on this

investigation, I believe that ROMANO called K. DAYE to order nine ounces of cocaine ("nina"),

which K. DAYE priced at $10,500 ("10-5"). ROMANO was shocked at K. DAYE's proposed

price and then asked for pricing on 125 grams of cocaine ("four play"). From training, experience,

and my work on this investigation, I know that a "four play" or "four way" refers to 125 grams of

cocaine, which would amount to half of nine ounces ("nina") and roughly double 62 grams

("doob"). I know that "four play" or "four way" refers to 125 grams of cocaine, as opposed to

four ounces, for the following reasons. Were a kilogram of cocaine divided into pieces, half a

kilogram would amount to 500 grams, half of that amount would be 250 grams ("nina," or nine

ounces"), half of that would be 125 grams ("four play" or 4.5 ounces), and half of that amount

would equate to 62 grams ("doob"). K. DAYE indicated it would cost half of $10,500 ("half of

that"). ROMANO agreed to that deal, but noted that he used to purchase 125 grams for $4,700

("Goddamn, I was getting it for 47"). Based on my narcotics experience in this and other

investigations, I believe that the price of cocaine was going up because of the coronavirus

pandemic, which had already begun to reduce the supply of cocaine from Mexico to California.

17.     On February 23, 2020, at 6:40 p.m., K. DAYE on Target Telephone 18 called

ROMANO on telephone number (957) 236-4438. ROMANO said, "Tried to holla at you

yesterday, the other day, I had my son all day the other day that's why I cancelled on you." K.

DAYE responded, "Oh, I thought you should've, yeah yesterday my man my stepson's birthday

so I wasn't doing nothing. So are you good?"  ROMANO said, "Nah, nah I wanna see ya um…

then on top of that my umm, when I get my taxes, my whole shit didn't go in so I was gonna see

if I could get the ummm… just one of them niggas."  K. DAYE responded, "Aight, aight cool.

Tomorrow morning early."  ROMANO asked, "Yeah, that's five, right?" K. DAYE confirmed,

"Yes."  ROMANO said, "Alright so umm, call me when you get up."  I believe that ROMANO

again ordered 125 grams of cocaine from K. DAYE when he asked for "one of them niggas."

ROMANO also confirmed the price as "five," meaning $5,000, which I know to be consistent with

current street pricing for such a quantity of cocaine.  Additionally, from ROMANO and K.

DAYE's prior call on February 21, 2020, where ROMANO also ordered 125 grams of cocaine, I

know that K. DAYE charged ROMANO "half" of $10,500, which is just over $5,000.

18.    On February 24, 2020, at 1:10 p.m., K. DAYE used Target Telephone 18 to call

ROMANO on telephone number (857) 236-4438. K. DAYE asked ROMANO, "Yo, what time

you coming around?"  ROMANO said, "Uh, what we going to do?  The same thing?"  K. DAYE

uttered, "Uh?" ROMANO asked, "As last time? The food place?"  K. DAYE replied, "Yeah, yeah,

yeah."  ROMANO responded, "Okay, um, I will be that way in like what… 2:30?"  K. DAYE

said, "Aight, that's cool."  Based on this telephone call, I believe that ROMANO and K. DAYE

were going to meet about 2:30 p.m. that day to do a drug deal.  Accordingly, agents conducted

surveillance on K. DAYE.

19.    That same day, at 2:20 p.m., K. DAYE used Target Telephone 18 to call ROMANO

on telephone number (857) 236-4438.  K. DAYE asked, "How long, fool?" ROMANO responded,

"I'm about to jump on the road now."  K. DAYE said, "Aight, cool, cool, cool."  ROMANO stated,

"I'll call you as soon as I get close to you, alright?"  K. DAYE responded, "Alright, got you."

20.     About an hour later, at 3:12 p.m., ROMANO (on (857) 236-4438) called K. DAYE (on Target Telephone 18).  K. DAYE said, "I'll be there."  ROMANO replied, "Aight."  K. DAYE said, "Aight."  At 3:30 p.m., surveillance saw K. DAYE arrive at Frank's Restaurant (located at 265 North Pearl Street, Brockton, MA) driving a white 2019 Ford F-250 with Massachusetts registration 1TLK41,registered to K. DAYE (the "white F-250").  K. DAYE exited the white F-250 and walked down the side of the restaurant with a black male whom agents subsequently identified as ROMANO based on a review of his driver's license photograph.  K. DAYE and ROMANO entered a blue 2007 Honda Accord with Massachusetts registration 9ZB391 (registered to E.R.) (the "blue Accord"), which was previously parked at the restaurant.  After being in the blue Accord for approximately twenty seconds, K. DAYE exited the car and went back to his white F-250.  Both vehicles left the area, and surveillance followed the blue Accord.  Based on the calls, the observations of K. DAYE and ROMANO's brief meeting, and my experience in drug investigations, I believe that K. DAYE and ROMANO had done a drug deal.

21.     Surveillance followed the blue Accord without stopping or losing sight until it reached Taunton, Massachusetts.  At 3:56 p.m., the blue Accord pulled to the side of the road in front of 157 School Street, Taunton, Massachusetts.  Surveillance approached ROMANO.  During their encounter, officers recovered 125 grams of a white powder, rock-like substance from inside the blue Accord.  Agents believed the substance, which is pending state lab testing, was cocaine based on their training and experience.  Officers also called phone number (857) 236-4438 – which had been in communication with K. DAYE – and a cellular telephone on ROMANO's person rang.

## IV.    CONCLUSION

22.    Based on the foregoing, there is probable cause to believe that ROMANO conspired to distribute and to possess with intent to distribute cocaine, in violation of Title 21, United States Code, Section 846.  In light of the evidence summarized above, I respectfully request that the Court issue the requested criminal complaint.

Signed under the pains and penalties of perjury this 3rd day of November, 2020.

James A. Peters
Task Force Officer
Drug Enforcement Administration


Sworn to and subscribed before me by telephone this 3rd day of November, 2020.

HON. MARIANNE B. BOWLER
United States Magistrate Judge